UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JENNIFER E. YATES,

    *Plaintiff*,

v.                                    CASE NO. 11-CV-15028

COMMISSIONER OF               DISTRICT JUDGE STEPHEN J. MURPHY, III
SOCIAL SECURITY,               MAGISTRATE JUDGE CHARLES E. BINDER

    *Defendant*.
_____/

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**[1]

## I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence does not support the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **GRANTED**, that Defendant's Motion for Summary Judgment be **DENIED**, and that the case be **REMANDED** to the Commissioner for further proceedings under Sentence Four of 42 U.S.C. § 405(g).

## II.    REPORT

### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing the Commissioner's decision denying Plaintiff's claim for Supplemental Security Income ("SSI") benefits. This matter is currently before the Court on cross-motions for summary judgment. (Docs. 9, 12.)

Plaintiff was 32 years of age at the time of the most recent administrative hearing. (Transcript, Doc. 7 at 31.) Plaintiff's employment history includes work as an assistant manager

---

[1]The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), the recently amended provisions of Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://jnet.ao.dcn/img/assets/5710/dir7-108.pdf. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

in a movie store, technical support for an internet company, waitress, office clerk/clerical work, and a fast food worker for less than one year each. (Tr. at 152.) Plaintiff filed the instant claim on January 6, 2011, alleging that she became unable to work on June 1, 2004. (Tr. at 105.) The claim was denied at the initial administrative stage. (Tr. at 47.) In denying Plaintiff's claim, the Commissioner considered anxiety-related disorders and other and unspecified arthropathies as possible bases for disability. (*Id.*) On June 16, 2011, Plaintiff appeared before Administrative Law Judge ("ALJ") Myriam C. Fernandez Rice, who considered the application for benefits *de novo*. (Tr. at 9-25; 27-46.) In an decision dated June 24, 2011, the ALJ found that Plaintiff was not disabled. (Tr. at 21.) Plaintiff requested a review of this decision on August 2, 2011. (Tr. at 7-8.)

The ALJ's decision became the final decision of the Commissioner, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), when, after the review of additional exhibits[2] (Tr. at 4, 184-86, 293-96), on September 21, 2011, the Appeals Council denied Plaintiff's request for review. (Tr. at 1-6.) On November 14, 2011, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision.

**B.    Standard of Review**

In enacting the social security system, Congress created a two-tiered structure in which the administrative agency handles claims and the judiciary merely reviews the determination for exceeding statutory authority or for being arbitrary and capricious. *Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 890, 107 L. Ed. 2d 967 (1990). The administrative process itself is multifaceted in that a state agency makes an initial determination that can be appealed first to the agency itself, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137, 142, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987). If relief is not found during the administrative

---

[2]In this circuit, where the Appeals Council considers additional evidence but denies a request to review the ALJ's decision, since it has been held that the record is closed at the administrative law judge level, those "AC" exhibits submitted to the Appeals Council are not part of the record for purposes of judicial review. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996); *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993). Therefore, since district court review of the administrative record is limited to the ALJ's decision, which is the final decision of the Commissioner, the court can consider only that evidence presented to the ALJ. In other words, Appeals Council evidence may not be considered for the purpose of substantial evidence review.

review process, the claimant may file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'") (citing *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence")); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (an "ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability). "However, the ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers,* 486 F.3d at 247 (quoting S.S.R. 96-7p, 1996 WL 374186, at *4).

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "there exists in the record substantial evidence to support a different conclusion." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006).

3

*See also Mullen*, 800 F.2d at 545. The scope of a court's review is limited to an examination of the record only. *Bass,* 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers,* 486 F.3d at 241. *See also Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (citing *Mullen*, 800 F.2d at 545).

When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party"); *Van Der Maas v. Comm'r of Soc. Sec.*, 198 Fed. App'x 521, 526 (6th Cir. 2006).

### C.    Governing Law

The "[c]laimant bears the burden of proving his entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994). *Accord Bartyzel v. Comm'r of Soc. Sec.*, 74 Fed. App'x 515, 524 (6th Cir. 2003). There are several benefits programs under the Act, including the Disability Insurance Benefits ("DIB") program of Title II, 42 U.S.C. §§ 401 *et seq.*, and the SSI program of Title XVI, 42 U.S.C. §§ 1381 *et seq*. Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who become disabled. F. Bloch, Federal Disability Law and Practice § 1.1 (1984). While the two programs have different eligibility

requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston,* 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin,* 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his] impairments and the fact that [he] is precluded from performing [his] past relevant work[.]" *Jones*, 336 F.3d at 474 (cited with approval in *Cruse,* 502 F.3d at 540). If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the Commissioner. *Combs v. Comm'r*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the

national economy that [claimant] could perform given [his] RFC [residual functional capacity] and considering relevant vocational factors." *Rogers,* 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

**D.  ALJ Findings**

The ALJ applied the Commissioner's five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff had not engaged in substantial gainful activity since December 23, 2010, the application date. (Tr. at 14.) At step two, the ALJ found that Plaintiff's fibromyalgia, back pain secondary to paracentral disc protrusion L4-L5, post traumatic stress disorder, depression, and borderline personality disorder were "severe" within the meaning of the second sequential step. (*Id.*) At step three, the ALJ found no evidence that Plaintiff's combination of impairments met or equaled one of the listings in the regulations. (Tr. at 15-16.) At step four, the ALJ found that Plaintiff was unable to perform any past relevant work. (Tr. at 19-20.) The ALJ also found that Plaintiff was a younger individual, age 18 to 49, on the date the application was filed. (Tr. at 20.) At step five, the ALJ found that Plaintiff retained the residual functional capacity to perform a limited range of medium work. (Tr. at 16- 19.) Therefore, the ALJ found that Plaintiff was not disabled. (Tr. at 21.)

**E.  Administrative Record**

A review of the relevant medical evidence contained in the administrative record indicates that Plaintiff was treated for both mental and physical impairments.

**1.  Physical Impairments**

In September 2003, Plaintiff sought treatment after "she was hit in the back of the head with a ceramic bowl on 9-29-03 by her mother's boyfriend," and, although "she underwent a CT of her head at that time and it was normal[,]" she "continues to have headaches but they are not as severe." (Tr. at 196.)

In February 2004, Plaintiff sought treatment for "a one week history of nausea, dizziness with general aches in her body including lower abdominal and back pain." (Tr. at 193.) It was noted that Plaintiff "consumes 3-4 cans of Mountain Dew daily which is down from 12 to 14 cans"

and that she had a "tubal ligation three years ago but she felt her symptoms were so similar to her symptoms of pregnancy that a home test was necessary." (*Id.*) It was also noted that Plaintiff had "three small children, a full time job and goes to school on the weekends." (*Id.*)

In September 2004, Plaintiff was seen by Michael J. Morrison, M.D., for "evaluation of bilateral knee pain, right greater than left." (Tr. at 204.) Dr. Morrison noted that "Dr. Saniuk is treating her with NAPROSYN." (*Id.*) Dr. Morrison found Plaintiff exhibited "grating and crepitus involving the patellofemoral joints" but nonetheless had "no effusion" and had "[f]ull ROM" with "[n]o instability to any joint line tenderness." (*Id.*) Dr. Morrison diagnosed "[c]hondromalacia patellofemral joint both knees[,]" injected her right knee with Depo Medrol and Xylocane, and recommended that she "continue with her anti-inflammatory medication." (*Id.*)

An MRI taken in October 2004 showed "[m]inimal tear inner margin anterior medial meniscus, injury at this location is unlikely to be symptomatic or significant" and "no acute injury [was] recognized." (Tr. at 206.)

In October 2004, Stephen R. Brown, M.D., examined Plaintiff for a "second opinion in regard to her right knee." (Tr. at 201.) Dr. Brown "agree[d] that she has some significant patellofemoral symptoms, however, [he did] not think she has any clinical findings consistent with a possible medial meniscus tear" so he recommended "conservative measures for now, including physical therapy and anti-inflammatory medications." (*Id.*) Plaintiff was also seen in the emergency room in October 2004 for a "[l]eft foot sprain" after she "got up from the couch and it felt like her left foot got stuck underneath her sustaining pain to the dorsum of her foot." (Tr. at 213-14.)

In November 2004, Plaintiff's physical therapist, Paul Gardner, noted that Plaintiff "demonstrates symptoms consistent with a left ankle sprain with a hyperextension injury" and that she "tolerated [the] initial session well and demonstrates good rehab potential." (*Id.*)

In May 2005, Plaintiff underwent a "[d]iagnostic arthroscopy, right knee" with "[p]atellofemoral chondroplasty" and "[a]rthroscopic lateral release." (Tr. at 211.)

In September 2005, Robert J. Saniuk, M.D., examined Plaintiff for her knee pain, diagnosed her with "chondromalacia of patella, left knee" and "fibromyalgia" and "[c]leared [her] for arthroscopy." (Tr. at 209.)

An EMG in March 2006 was "normal" and showed "no evidence of cervical radiculopathy or brachial plexopathy of both upper extremities" and "[n]o evidence of diffuse peripheral neuropathy or mononeuropathy such as carpal tunnel syndrome or ulnar or radial mononeuropathy of both upper extremities." (Tr. at 230.)

Plaintiff was also treated by Ali A. Karrar, M.D. In May 2006, Dr. Karrar evaluated Plaintiff and found she had "generalized aches and pains and diffuse tenderness in all her joints." (Tr. at 219.) Dr. Karrar diagnosed Plaintiff with fibromyalgia because he "d[id]n't see a[ny] clinical evidence to support specific connective tissue disease or inflammatory arthritis." (Tr. at 218.) Dr. Karrar also "strongly recommend[ed]" that Plaintiff "be seen by a psychiatrist." (Tr. at 220.)

In July 2006, Plaintiff was examined by James Culver, M.D., who noted that Plaintiff was "referred by Dr. Mohamedally, her primary care physician, reporting pain everywhere, including her head, her face and every area of her body. She reports that her symptoms developed in 1992 when she was about 14 years old [and that] symptoms began spontaneously." (Tr. at 223.) Dr. Culver noted that Plaintiff "came in by wheelchair" and stated that her "father-in-law had to pick her up out of the car and place her in the wheelchair." (Tr. at 224.) Dr. Culver further noted that Plaintiff "was able to move from the wheelchair and seat herself on the examination table but she appeared to be clumsy and I am not sure she was making full effort. She more or less dragged her legs but then she was able to step on the exam table and push herself back." (*Id.*) Dr. Culver also found Plaintiff's "patellar and Achilles tendon reflexes [were] intact." (*Id.*) Although Dr. Culver noted diminished quadricep and plantar flexion strength, he opined that "this is effort dependent rather than representing a motor deficit." (*Id.*) Dr. Culver also noted that Plaintiff reported "tenderness on palpitation of practically all areas of the body." (*Id.*) Dr. Culver diagnosed low back syndrome, sciatica, and possible fibromyalgia, and ordered a series of lumbar epidural steroid

8

injections. (Tr. at 225.) After undergoing the first two injections, Dr. Culver noted that Plaintiff had "not seen any improvement with the first two treatments. In fact, she states that her symptoms seem to be worsening," so Dr. Culver cancelled the third and final injection. (Tr. at 227.)

An MRI of Plaintiff's lumbar spine taken on January 4, 2011, showed "[c]entral and slightly right paracentral disc protrusion L4-L5 causing mild deformity of thecal sac without definite neural compression[,]" "[d]egenerative disc disease at both L4-L5 and L5-S1[,]" and "[d]egenerative changes in the facets at both L4-L5 and L5-S1." (Tr. at 288.) An MRI of Plaintiff's thoracic spine taken on April 8, 2011, was "within normal limits." (Tr. at 290.)

Plaintiff was examined at the request of Disability Determination Services ("DDS") by physician R. Scott Lazarra, M.D., on March 9, 2011. (Tr. at 278-82.) Dr. Lazarra noted that Plaintiff exhibited "no evidence of joint laxity, crepitance, or effusion," that her "[g]rip strength remains intact[,]" that her "[d]exterity is unimpaired [as Plaintiff] could pick up a coin and button clothing[,]" and that she "had no difficulty getting on and off the examination table, no difficulty heel and toe walking, no difficulty squatting, and no difficulty standing on either foot." (Tr. at 279.) Dr. Lazarra concluded:

> The patient's back pain was really not assessable but there was no obvious diminished range of motion or joint abnormalities. Similar findings were in her knees. She has normal power. She had no difficulty doing orthopedic maneuvers and her gait was stable. Her main issue does appear to be her anxiety and she did appear significantly anxious today presumably due to her posttraumatic stress. She does have poor sleeping habits presumably due to anxiety and insomnia. A neuropsych evaluation for stabilization would be indicated. Physically her degree of impairment appeared minimal. Her prognosis is good but again her main issue is neuropsych.

(Tr. at 282.)

### 2. Mental Impairments

An undated case briefing by Kristen Thompson, LLMSW, of the St. Clair Community Mental Health Authority, indicated that Plaintiff had received clinical and psychiatric services for the primary diagnosis of Post Traumatic Stress Disorder ("PTSD"). (Tr. at 181.) She stated that the PTSD "stems from past abusive relationships where Lapper [sic] County DHS Adult Protective Services removed Jennifer from the abuser's home." (*Id.*) Ms. Thompson stated that Plaintiff had

"also been diagnosed with Mood Disorder NOS" and that she "currently meets with a clinician regularly to improve self-calming skills" and she "meets with her psychiatrist every 2-4 weeks for monitoring of her medication." (*Id.*) Ms. Thompson noted that

> [e]ven with support, Jennifer continues to exhibit symptoms which prevent her from being in places with many people, low tolerance for typical stress (medical appointments, waiting rooms, etc.) and strong reactions to loud noises such as people knocking on her door . . . . She often displays unusual behavior while trying to cope with the above mentioned stressor such as pacing, sitting bent over at the waist and crying and laughing out loud inappropriately.

(Tr. at 181-82.) Ms. Thompson also noted that Plaintiff has difficulty "maintaining boundaries with others" and quickly befriends people who "use the limited resources she has." (Tr. at 182.) "For example, she allowed a friend to use her bridge card to bu[y] her groceries and he never brought any to her." (*Id.*)

On November 23, 2010, Nancy Ceglarek, LMSW, completed the initial health plan. (Tr. at 251-60.) As to daily living skills, Plaintiff indicated she was completely independent in all areas, including personal hygiene, mobility, medication, laundry, cooking, bill-paying, and leisure, but needed guidance or direction with respect to housekeeping. (Tr. at 253.) However, Ms. Ceglarek nonetheless checked boxes indicating that Plaintiff had substantial disability/impairment in all primary aspects of daily living, i.e., personal hygiene and self-care, self-direction, activities of daily living, learning and recreation, and social transactions and interpersonal relationships. (Tr. at 257.) In addition, Ms. Ceglarek opined that Plaintiff had "strong abilities and would need minimal assistance with linking [to support systems] as she is unfamiliar with the area" and that Plaintiff "is intelligent, has some insight and strong survivor instincts" and "verbalizes motivation for treatment." (Tr. at 258.) Plaintiff also reported that she had been jailed for possession of marijuana, and explained that she had obtained a license for medical marijuana but that the license had expired. (Tr. at 254.)

A Clinical Assessment was completed by Ms. Ceglarek on November 30, 2010. Plaintiff reported:

> "Everything brought me in. My kids are gone. I was physically, verbally, and sexually abused by my fiancé and he was murdered in March, 2004." Jennifer

10

> reports physical and verbal abuse by her parents and first overdosed at age 14. She reports several other attempts with her last attempt 10 years ago. She suffered multiple contusions during the physical abuse from her fiancé over the last 3 years. Currently, she reports flashbacks, difficulty with sleep, anxiety, racing thoughts, appetite disturbance, and isolation related to feeling unsafe. "I am not suicidal now. I figured out that it just isn't going to work."

(Tr. at 233.) Ms. Ceglarek noted degrees of disturbance/dysfunction as "unremarkable" with respect to posture, general body movements and all aspects of affect/mood, but noted minor disturbance/dysfunction with facial expression and amplitude and quality of speech. (Tr. at 234.) Ms. Ceglarek also noted the degree of disturbance/dysfunction was unremarkable in all areas of perception and thinking, other than a moderate level with respect to memory based on the fact that Plaintiff "reports significant impairment of her short term memory but long term memory is intact." (Tr. at 235.) Ms. Ceglarek diagnosed PTSD, and Mood Disorder NOS, assessed a GAF score of 40 and a "fair" prognosis. (Tr. at 236, 241.)

On December 8, 2004, a Psychiatric Evaluation was conducted by Mullai Muthuswami, M.D. Dr. Muthuswami summarized:

> She was on time for her appointment and she was appropriately dressed for the weather. She did not have any abnormal motor movements. She had fairly good eye contact. Her speech was not pressured. She was spontaneous and her thought process was coherent and goal oriented. No loose associations were noted at any time. No pressured speech or flight of ideations were noted. Her affect was appropriate to her thought process and her mood was anxious. She was tearful at times and she was also crying at times. She denied any hopelessness or helplessness and denied having any feelings to hurt self or others. She denied having any auditory or visual hallucinations. She reported that she does not like being around people but she denied having any persecutory feelings at this time. Her thoughts were organized. Cognition was fairly good but she reports that she does have problems in recalling recent events. She reports that she is having severe anxiety, which is interfering with her memory. She seemed like she was working at an average level of IQ and she has fairly good insight and judgment at the present time.

(Tr. at 239, 275.) Dr. Muthuswami diagnosed PTSD, "Major depressive disorder, recurr, severe w/o psych," and assessed a GAF score of 40. (Tr. at 240, 276.) Dr. Muthuswami indicated that he would "start her on a small dose of Ativan to decrease her anxiety" and "will consider adding a small dose of antidepressant medication if needed[.]" (*Id.*)

Plaintiff was examined at the request of Disability Determination Services ("DDS") on February 7, 2011, by Christian Barrett, Ed.D., who concluded:

11

> Jennifer states that her principal limiting conditions involve chronic pain in multiple parts of her body. These symptoms appear to be the result of years of physical abuse and trauma. Jennifer appeared depressed and very anxious and tense throughout the interview. She isolates herself. She feels unsafe around people. Jennifer feels that she has been abused both emotionally and physically throughout her life, making her reluctant to engage with others. Cognitive functioning appears average. Mild deficits are noted in her ability to understand, remember, and carry out simple instructions as well as ability to make judgments on simple work-related decisions. Mild-moderate functional restrictions are noted in her ability to make judgments on complex work-related decisions. Moderate-marked functional restrictions are noted in her ability to interact appropriately with the public, supervisors and co-workers as well as respond appropriately to usual work situations and to changes in a routine work setting.

(Tr. at 271.) Dr. Barrett diagnosed PTSD, Major Depression, and Personality Disorder (Borderline, Paranoid, Avoidant), assessed a GAF score of 45 and indicated that Plaintiff would be able to manage her funds. (*Id.*)

### 3. Plaintiff's Activity Report and Testimony

In her daily activity report, Plaintiff indicated that "everything I do hurts." (Tr. at 160.) Plaintiff stated that "sometimes it hurts too bad to let my back touch the bed, sometimes I'm so wiped from pain I just pass out." (Tr. at 161.) As to reminders about grooming, Plaintiff stated, "I'll forget until it gets really obvious, then I'll remember, maybe 2x a week," but that she does not need reminders to take medication. (Tr. at 161-62.) Plaintiff prepares her own meals, "something quick that doesn't require standing for more than a few minutes," and she indicated she "wipes counters" but that "there isn't much of it [house and yard work] I can physically do anymore." (Tr. at 162-63.) Although Plaintiff is able to walk, ride in a car, and use public transportation alone, she added, "my muscles spasm too much for it to be safe. My leg or arm spasming while driving could be very bad." (Tr. at 163.) Plaintiff also indicated that she shops in stores for food and household necessities, and is able to manage money. (*Id.*) Plaintiff's hobbies include singing, reading, and crochet, she likes to sit and talk, and she also attends church and Community Mental Health ("CMH") sessions. (Tr. at 164.) Plaintiff stated that she "can't talk to most people unless I have to, it scares me," but that she "used to talk to anyone." (Tr. at 165.)

Plaintiff testified at the administrative hearing that she is able to make meals and grocery shop, but that she does not drive and so she relies on CMH for transportation. (Tr. at 33-34.)

12

Plaintiff further testified that she sees her doctor once a month, that her medications have been adjusted with various results, and that she participates in therapy once a week. (Tr. at 34-35.) Plaintiff stated that she has a medical marijuana license but that she has not used it in a year because she has no income. (Tr. at 35.) Plaintiff indicated that she found marijuana to be "[w]ay more effective" than prescription medication because it "doesn't tear your stomach up." (*Id.*) Plaintiff explained why she stopped working in 2004:

> I had one knee surgery in March and I had the other one done in like October, as soon as the first one healed enough. Then, by the time that one healed I moved back to Michigan and a few months after that is when I ended up stuck in the bed from all of the pills they had me on.

(Tr. at 36.) When later asked what caused her to stop working, Plaintiff stated, "It was the guy that kept bringing a whip to work, telling me he wanted to collar me as his slave, honestly." (Tr. at 38-39.) Plaintiff added that this "guy had been harassing" her and "[i]t got to the point where . . . [she] just had a panic attack" when she saw him. (Tr. at 39.) Plaintiff stated that she reported the problem to human resources, but after a week-long training session they "brought him right back and sat him two seats away from me." (*Id.*) When asked what prevented her from going back to work after that, Plaintiff responded:

> Honestly, I have tried a few times and it is the conditions that you have to list on the application, to be honest. You know, I don't have knees to speak of. I have a lot of problems with my back and that, in and of itself, limits a lot of the things that I could do. I don't even have to put post traumatic stress disorder down and they already told me no.

(*Id.*)

When asked whether she was currently having any problem with her knees, Plaintiff responded that "[t]here is no cartilage in them, but the kneecap is only about half the size it is supposed to be" and, when asked how that effects her, Plaintiff stated, "You can't really do much sitting and standing, squatting, [or] walking" because "after a while, no matter how much you ignore the pain[,] it is going to give out to one side or another and that's not going to be good." (Tr. at 37.) When asked what bothers her most, standing or sitting, Plaintiff responded, "Probably sitting, trying to do it slowly enough to not hurt my back when I sit because that is harder on the

13

knees." (*Id.*) Plaintiff stated that her most comfortable position is laying on her left side. (*Id.*) Plaintiff stated that she has a lap-top computer and plays Mahjong and Minesweeper on it but that she doesn't watch television because there are "[t]oo many triggers on T.V." such as violence, guys yelling, people getting shot, girls getting raped, "anything that involves something close to [her] past." (Tr. at 37-38.) Plaintiff indicated that the last time she drank alcohol was "[t]he day of the memorials[,]" March 27, 2010, after she and her best friend "walked in and her mom had been murdered by her boyfriend before he shot himself . . . ." (Tr. at 40.)

### 4. Testimony from the Vocation Expert ("VE")

The ALJ asked the VE to assume:

> a hypothetical individual at the medium level. Please assume that this individual could only occasionally kneel or crawl. Additionally, please assume that this individual would need to be employed and work that is limited to simple routine or repetitive tasks, employed in a low-stress job meaning only occasional decision making required. Please assume that this individual would need to be employed in a job with only occasional interaction with the public and only occasional interaction with coworkers.

(Tr. at 43.) The VE responded that such a person could not perform Plaintiff's past relevant work. (*Id.*) The VE further testified that such a person could perform the following medium, unskilled jobs available in the State of Michigan: 5,000 cleaner positions, 3,000 attendant positions, and 3,000 laundry worker positions. (Tr. at 43-44.) The VE added that such a person could also perform the following light, unskilled, jobs in the State of Michigan: 5,000 cleaner positions, 3,000 sorter positions, and 3,000 various [INAUDIBLE] positions. (Tr. at 44.)

### F. Analysis and Conclusions

### 1. Legal Standards

The ALJ determined that during the time Plaintiff qualified for benefits, she retained the residual functional capacity to perform a limited range of medium work. (Tr. at 16-18.) "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work." 20 C.F.R. 404.1567(c).

14

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

### 2. Substantial Evidence

Plaintiff contends that the ALJ's decision is not supported by substantial evidence. (Doc. 9.) As noted earlier, if the Commissioner's decision is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence supports the opposite conclusion. *McClanahan,* 474 F.3d at 833; *Mullen,* 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

Specifically, Plaintiff contends that the "ALJ errs in attributing limited weight to the opinions expressed by Mr. Christian Barrett, consulting examiner" (Doc. 9 at 12-15) and "errs in attributing limited weight to the opinions of the severity of Plaintiff's impairments expressed by Plaintiff's treating psychiatrist." (Doc. 9 at 15-17.)

In weighing the opinions and medical evidence, the ALJ must consider relevant factors such as the length, nature and extent of the treating relationship, the frequency of examination, the medical specialty of the treating physician, the opinion's evidentiary support, and its consistency with the record as a whole. 20 C.F.R. § 404.1527(d)(2)-(6). Therefore, a medical opinion of an examining source is entitled to more weight than a non-examining source and a treating physician's opinion is entitled to more weight than a consultative physician who only examined the claimant one time. 20 C.F.R. § 404.1527(d)(1)-(2). *See also Rogers*, 486 F.3d at 242 (stating that the "treating physician rule," which provides that "greater deference is usually given to the opinions of treating physicians than to those of non-treating physicians," is a key governing standard in social security cases). "Moreover, when the physician is a specialist with respect to the medical condition at issue, . . . her opinion is given more weight than that of a non-specialist." *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011).

The opinion of a treating physician should be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in [the] case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(d)(2). If the ALJ declines to give controlling weight to a treating source's opinion, then he must use the following factors to determine what weight the opinion should be given: "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson*, 378 F.3d at 544. Where the ALJ "failed to conduct the balancing of factors to determine what weight should be accorded these treating source opinions . . . , [t]his alone constitutes error, as '[a] finding that a treating source medical opinion . . . is not entitled to controlling weight [does] not [mean] that the opinion should be rejected.'" *Cole v. Comm'r of Soc. Sec.*, 652 F.3d 653, 660 (6th Cir. 2011) (quoting *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009)).

A physician qualifies as a treating source if the claimant sees the physician "with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition." 20 C.F.R. § 404.1502. After treating sources, a "nontreating source, who physically examines the patient 'but does not have, or did not have an ongoing treatment relationship with' the patient, falls next along the continuum." *Norris v. Comm'r of Soc. Sec.*, 461 Fed. App'x 433, 439 (6th Cir. 2012) (quoting *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007)). "'The opinion of a non-examining physician, on the other hand, 'is entitled to little weight if it is contrary to the opinion of the claimant's treating physician.'" *Adams v. Massanari*, 55 Fed App'x 279, 284 (6th Cir. 2003) (quoting *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987)).

"Claimants are entitled to receive good reasons for the weight accorded their treating sources independent of their substantive right to receive disability benefits." *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits "must contain

specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight." S.S.R. 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. "This requirement is not simply a formality; it is to safeguard the claimant's procedural rights." *Cole*, 2011 WL 2745792, at *4. "[A] failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

> As to the consulting examiner, the ALJ concluded that Dr. Barrett
>
> lacks the qualifications to opine as a medically acceptable source under the regulations concerning the claimant's GAF score (20 CFR 404.1513(d) and 416.913(d)). Moreover, the psychologist's GAF assessment, effectively a snapshot in time based on a single interview with the claimant, appears to underestimate the claimant's capabilities, even as the claimant herself describes them. The undersigned has accordingly given limited weight to the consultative psychological examiner's assessment.

(Tr. at 18-19.) As noted by the Defendant Commissioner, Plaintiff "does not identify" the treating psychiatrist by name, but, based on the record, Plaintiff must be referring to either Ms. Ceglarek or Dr. Muthuswami. (Doc. 12 at 16.)[3]

The ALJ's reasoning is difficult to discern. If the ALJ meant to say that neither the Commissioner nor the Sixth Circuit requires that GAF scores, even consistent ones, be given any weight at all, he would be correct.

> [T]he Commissioner "has declined to endorse the [GAF] score for 'use in the Social Security and SSI disability programs,' and has indicated that [GAF] scores have no 'direct correlation to the severity requirements of the mental disorders listings.'" The GAF scores, therefore, are not raw medical data and do not necessarily indicate improved symptoms or mental functioning.

*Kennedy v. Astrue*, 247 Fed. App'x 761, 766 (6th Cir. 2007) (citations omitted) (finding that increase in GAF score from 55 to 60 was insignificant). Therefore, any decision not to rely on the

---

[3]I note that Dr. Muthuswami's functional capacity assessment was submitted only to the Appeals Council and cannot be considered part of the record for this Court's review. (Tr. at 293-96.)

17

GAF score is of little consequence and would not undermine a decision supported by substantial evidence. *See also Oliver v. Comm'r of Soc. Sec.*, No. 09-2543, 2011 WL 924688, at *4 (6th Cir. Mar. 17, 2011) (upholding ALJ's decision not to rely on GAF score of 48 because it was inconsistent with other substantial evidence in the record and noting that the "GAF score is not particularly helpful by itself"); *Turcus v. Soc. Sec. Admin.*, 110 Fed. App'x 630, 632 (6th Cir. 2004) (upholding ALJ's reliance on doctor's opinion that plaintiff could perform simple and routine work despite GAF score of 35).

However, if the ALJ's conclusion is that Dr. Barrett lacks the qualifications to opine as a medically acceptable source under the regulations as to topics beyond GAF scores, then the ALJ is mistaken. As an examining source, Dr. Barrett was "next along the continuum" after treating physicians. *Norris,* 461 Fed. App'x at 439.

As to Plaintiff's treating source, Dr. Muthuswami, the ALJ did not discuss his findings at all.[4] Where, as here, the ALJ "failed to conduct the balancing of factors to determine what weight should be accorded the[] treating source opinion[] . . . , [t]his alone constitutes error." *Cole,* 652 F.3d at 660. The ALJ's silence makes it impossible to conduct "meaningful review" of his decision. *Wilson*, 378 F.3d at 544. I therefore recommend that the case be remanded to the Commissioner for further proceedings, including reconsideration of the opinions of Drs. Barrett and Muthsuwami, pursuant to sentence four of 42 U.S.C. § 405(g). *See Blakely*, 581 F.3d at 409-10 (holding that the ALJ failed to follow the treating source rules which precluded meaningful review and "REVERS[ing] the judgment of the district court with instructions to REMAND to the Commissioner for further proceedings consistent with this opinion.")

### III.    REVIEW

---

[4] I note that Ms. Ceglarek is not an acceptable medical source under the regulations. 20 C.F.R. § 404.1513(a); *Miller v. Comm'r of Soc. Sec.*, No. 1:08-CV-1022, 2010 WL 502761, at *5 (W.D. Mich. Feb. 5, 2010) (citing *Doolin v. Astrue*, No. 3:08-cv-243, 2009 WL 1212232, at *8 (S.D. Ohio May 1, 2009) ("a counselor's opinion is not entitled to controlling weight")). Therefore, the rules requiring deference or a rationale for rejecting the opinion do not apply. *Id.* (citing *Burke ex rel. A.R.B. v. Astrue*, No. 6:07-cv-376, 2008 WL 1771923, at *7 (E.D. Ky. April 17, 2008)).

18

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan*, 474 F.3d at 837; *Frontier Ins. Co.,* 454 F.3d at 596-97. Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be concise, but commensurate in detail with the objections, and shall address specifically, and in the same order raised, each issue contained within the objections.

                                                   s/ **Charles E Binder**
                                                   CHARLES E. BINDER
Dated: August 27, 2012                         United States Magistrate Judge

**CERTIFICATION**

I hereby certify that this Report and Recommendation was electronically filed this date and served upon counsel of record via the Court's ECF System.

Date: August 27, 2012                     By     s/Patricia T. Morris
                                                             Law Clerk to Magistrate Judge Binder